**UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS**

**UNITED STATES**

**v.**

**Airman First Class CHANNING J. SPENCER**
**United States Air Force**

**ACM S32198**

**05 February 2015**

Sentence adjudged 23 October 2013 by SPCM convened at Yokota Air Base, Japan. Military Judge: Mark L. Allred.

Approved Sentence: Bad-conduct discharge, confinement for 1 month, forfeitures of $934.00 pay for one month, and reduction to E-1.

Appellate Counsel for the Appellant: Major Matthew T. King and Captain Jonathan D. Legg.

Appellate Counsel for the United States: Colonel William R. Youngblood; Major Daniel J. Breen; and Gerald R. Bruce, Esquire.

Before

MITCHELL, WEBER, and CONTOVEROS[1]
Appellate Military Judges

OPINION OF THE COURT

This opinion is issued as an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.

WEBER, Judge:

A special court-martial convicted the appellant, pursuant to his plea, of one specification of wrongful use of cocaine, in violation of Article 112a, UCMJ, 10 U.S.C.

---

[1] In a memorandum dated 20 May 2014, Major General Robert G. Kenny, then Performing Duties of The Judge Advocate General, designated Senior Judge Martin T. Mitchell as the Chief Appellate Military Judge in cases where Chief Judge Mark L. Allred served as the military judge or recused himself under the governing standards of judicial conduct. In this case, Chief Judge Allred, while serving as a trial judge, presided over the appellant's court-martial. Therefore, Chief Judge Mitchell designated the l panel in this case.

§ 912a. A panel of officer and enlisted members sentenced the appellant to a bad-conduct discharge, confinement for one month, forfeiture of $934 pay for one month, and reduction to E-1. The convening authority approved the sentence as adjudged.

The appellant alleges four bases for relief on appeal: (1) the military judge abused his limited discretion by failing to find implied bias or apply the liberal grant mandate to excuse the senior enlisted member of the panel because an Airman in the member's previous unit had committed a similar offense; (2) trial counsel's sentencing argument referencing the potential impact of the appellant's conduct on diplomatic relations with Japan unfairly prejudiced the appellant; (3) the Government's violation of the 30-day post-trial processing standard for forwarding the record of trial for appellate review warrants sentencing relief; and (4) his sentence was inappropriately severe when compared to that of a co-actor. We find no basis for relief and affirm.

*Background*

The appellant visited a series of bars in Roppongi, Japan, on 20 July 2013. At about 0200 hours, a club promoter invited the appellant and a friend into his establishment. There, the appellant's friend asked the promoter if he had any drugs. The promoter offered to sell an amount of cocaine to them for $120. The appellant contributed $100 toward this purchase. After the appellant's friend went to the bathroom with the bag of cocaine, the appellant went to the bathroom and inhaled five to six "bumps" of cocaine. This caused him to feel more alert and energetic. About three days later, the appellant provided a urine sample for drug testing pursuant to a random selection. His urine tested positive for the cocaine metabolite, and he confessed his drug use to investigators.

Further facts relevant to each issue are laid out below.

*Failure to Excuse a Member*

The appellant alleges the military judge erred by failing to excuse the senior enlisted member, Chief Master Sergeant (CMSgt) RR. The appellant contends CMSgt RR's answers about a drug use court-martial that occurred in his unit several years earlier demonstrated implied bias, which required the military judge to excuse him under the liberal grant mandate. As part of this argument, he contends the military judge did not adequately explain his rationale for retaining CMSgt RR, which should result in this court granting the military judge less deference. We find no error in the military judge's action.

In group voir dire, CMSgt RR indicated he had previously experienced a member in his military unit using drugs. In individual voir dire, the ensuing colloquy with trial counsel took place:

Q: I have just a couple questions for you. You mentioned there had been drug use in your unit before?

A: Yes.

Q: Can you talk about that a little bit?

A: Around 2003/2004 while I was assigned to a unit at Robins Air Force Base, Georgia, one of my subordinates was involved with, I think it was a crystal meth charge. So he was processed for discharge.

Q: Was he directly one of your subordinates or was - -

A: He was in my hydraulics shop, ma'am.

Q: So were you his direct supervisor or was there supervision in between?

A: There was one layer of supervision in between.

Q: And how involved were you with that case?

A: Just attending his court-martial.

Q: Did you testify at his court-martial?

A: No.

Q: Did you write a character letter?

A: No.

Q: Did it affect your unit at all?

A: Yes it did.

Q: How did it affect your unit?

A: For the time that the member was awaiting trial, we had to make some manning adjustments to provide coverage for our particular shop.

Q: But beyond that, I mean, did it affect your ability to complete the mission or get things done at all?

A: I would say yes.

Q: Okay, can you explain that?

A: The reason is, like I said, the amount of manning that I had qualified personnel. [sic] He was out of the work center. I could not use him on the flight line.

Q: So you said that was almost 10 years ago?

A: Correct.

Q: And has that changed your opinion of drug use in the military at all or has it colored your opinion at all?

A: No.

Q: Do you think that it would affect, in some manner, the way that you sentence the accused today?

A: No.

Q: So you think that you could give him a full – look at all of the facts, and give him a fair sentence?

A: Yes.

Trial defense counsel then questioned CMSgt RR:

Q: You mentioned that your troop that went to court for the meth use; that he was processed for discharge.

A: Correct.

Q: Did he receive a bad-conduct at the court or was there an admin discharge down the road?

A: I was – through the court.

Q: Okay.

A: I'm not 100 percent sure. I just know that he was discharged and there was some confinement.

Q: Okay. Do you remember how much?

A: I'm going to say 30 to 60 days, not 100 percent certain.

Q: Okay and I know we're going back almost a decade on you. And so you think 30 to 60 days confinement and a bad-conduct discharge?

A: I don't recall exactly what the exact discharge was.

Q: Okay so it could have been from the court as a bad-conduct or it could have been from your commander after the fact?

A: Correct.

Q: Gotcha. You mentioned you didn't testify or write any letters or anything like that?

A. No.

Q. Did you sit in throughout the whole proceeding?

A: No[,] not through the whole entire proceeding. Just more for the – like the last day or two.

Q: Okay. What were your impressions of that?

A: Just – my impression was, you know, I got to, you know, sit and I was basically able to hear what the members – you know he expressed his remorse, if you will, and basically apologized for what – his actions and how it affected us as a unit.

Q: What did that mean to you as a supervisor?

A: As a supervisor, I kind of felt he let us down.

Q: Is that specifically in that he chose to use drugs or, you mentioned, kind of, that there was some negative stuff for your unit due to his drug use?

A: Prior to that – the charge and the court-martial, he was one of our most – a stellar Airman, if you will, below the zone, that type of a caliber of an Airman.

Q: And so – and I don't want to put any words in your mouth but did you think that maybe he, kind of, threw all of that away with his decision to use drugs?

A: Correct.

Q: You got into some specifics about how him getting pulled impacted your shop; that you were short a man and that hurt everybody. Do you think that you'll be thinking about that at all when you're hearing about Airman Spencer's shop and the impact on them?

A: It's possible but I think I can be fair.

Military Judge: I'm going to instruct you that if you sit on this case, [CMSgt RR], that you're to put that case completely out of your mind and decide this case based solely on the evidence and the facts of this case. Do you believe that you can do that?

A: Yes, Your Honor.

The defense challenged CMSgt RR for cause, asserting that the case in CMSgt RR's prior unit contained similarities to the instant case and citing CMSgt RR's statement that he might be thinking about the previous case. The military judge ruled on the defense challenge as follows:

Okay[,] once again I don't need to hear a lot of debate over that. The defense challenge for cause against [CMSgt RR] will be denied. I carefully listened to his answers and with regard to the fact that there was an Airman in his unit more than a decade ago or several years ago at least that got involved with drugs and he had a very normal reaction that others in a military unit might have and that is that it harmed the unit and wasn't a particularly positive thing, that's all.

This doesn't show me any indication of any actual or implied bias on his part. [CMSgt RR] was very clear that he could separate that case from the present case and decide this case on its merits. So I – using the standard of actual and implied bias, I find neither, nor do I find that the liberal grant mandate warrants the excusal of [CMSgt RR] for cause.

"[I]ssues of implied bias are reviewed under a standard less deferential than abuse of discretion but more deferential than de novo." *United States v. Downing*, 56 M.J. 419, 422 (C.A.A.F. 2002). The reason for this intermediate level of deference is that implied bias is reviewed under an objective standard. *United States v. Miles*, 58 M.J. 192, 195 (C.A.A.F. 2003). However, "[a] military judge who addresses implied bias by applying the liberal grant mandate on the record will receive more deference on review than one that does not." *United States v. Clay*, 64 M.J. 274, 277 (C.A.A.F. 2007). In this regard, "[w]e do not expect record dissertations but, rather, a clear signal that the military judge applied the right law. While not required, where the military judge places on the record his analysis and application of the law to the facts, deference is surely warranted." *Id.* (quoting *Downing*, 56 M.J. at 422) (internal quotation marks omitted).

Implied bias is "viewed through the eyes of the public, focusing on the appearance of fairness." *United States v. Bagstad*, 68 M.J. 460, 462 (C.A.A.F. 2010) (quoting *Clay*, 64 M.J. at 277) (internal quotation marks omitted). Therefore, appellate courts employ an objective standard when reviewing a military judge's decision regarding implied bias. *United States v. Strand*, 59 M.J. 455, 458 (C.A.A.F. 2004). Under the implied bias standard, military judges are required to follow the "liberal grant" mandate, which "supports the UCMJ's interest in ensuring that members of the military have their guilt or innocence determined 'by a jury composed of individuals with a fair and open mind.'" *United States v. James*, 61 M.J. 132, 139 (C.A.A.F. 2005) (quoting *United States v. Smart*, 21 M.J. 15, 18 (C.M.A. 1985)). Where there is no showing of actual bias, "implied bias should be invoked rarely." *United States v. Leonard*, 63 M.J. 398, 402 (C.A.A.F. 2006). However, the military judge maintains responsibility to prevent both the reality and the appearance of bias in courts-martial. *Clay*, 64 M.J. at 277.

The appellant alleges the military judge did not sufficiently place his analysis and application of the law to the facts on the record, meaning we should grant his decision less deference. The government asserts that the military judge's invocation of the implied bias standard and the liberal grant mandate sufficiently demonstrate that he applied the right law. We need not decide how much deference is due the military judge on this issue, because under any standard, CMSgt RR's excusal was not warranted.

CMSgt RR remembered that an otherwise strong performer in his unit almost a decade earlier had been court-martialed for using a different drug than that involved in the instant case. We see nothing unusual about this fact. Sadly, it is not uncommon that

a senior military member will have experienced at some point a situation in which another military member in his or her unit has used illegal drugs. CMSgt RR's statements make clear that the case did not affect him in any unusual or personal way, the member did not appear to be close to him, and he did not even remember many details about the court-martial that took place many years earlier. Instead, the sole impact to CMSgt RR concerned the impact to the unit, and even then, the impact consisted solely of manning challenges and a general sense that the wrongdoer let down the unit, effects that would be expected in any court-martial. While CMSgt RR stated that he might recall that matter to some degree during the instant case, he also stated the earlier case would not affect his judgment at all and when instructed to do so he readily agreed to set aside any thoughts he had about the previous case. Under these circumstances, we easily conclude that a member of the public would harbor no substantial doubt as to the fairness of CMSgt RR's service on the panel.

*Trial Counsel's Sentencing Argument*

During the appellant's guilty plea providence inquiry, before the members were seated, some number of local Japanese government officials entered the gallery to observe the proceedings. The record does not indicate how many Japanese officials were present, and it does not reflect whether they remained for the duration of the proceedings. The record also indicates Japanese officials were present because at one point they had expressed an interest in prosecuting the appellant. Trial defense counsel stated he had no objection to the officials' presence in the courtroom.

Trial counsel's sentencing argument stated, in relevant part:

> Now, as you consider [the appellant's] crime, you need to consider all of the facts that are surrounding it because the accused in this case wasn't some Airman sitting in his dorm room with the door locked smoking a little bit of spice with his window open. The fact is, the accused was outside of our base, out in Japan, in downtown Roppongi over the course of an evening. He was breaking curfew. He was drinking. He was out with other Airmen. He was mingling with Japanese nationals while he was high as a kite. He was snorting cocaine in bathrooms and he's buying it from local Japanese – local people in the community. All of those things together; that is bad conduct. Members, you need to think about the fact that this is not our country. We are guests here in Japan and one of our jobs as military members is to be ambassadors to the country of Japan. You have all seen the effect that one or two Airmen can have on the entirety of U.S. Forces Japan. That is why we have rules that so strictly governed the way

that everyone behaves. Rules that say when you can be on base, when you can be off base, when you can drink and when you can't drink, when you have to have a wingman. The military has put those rules in place to make sure that they are able to keep the relationship between us and our host country healthy. The accused should be well aware that that is why they're there. When the accused left the base on 22 July, he decided to be an ambassador by getting high as a kite and going on a 6 hour bender through Tokyo.[2] Members, your response to that behavior needs to be loud and clear for the accused. This type of behavior is not acceptable in the United States military and if you want to behave that way, there's the door. A bad-conduct discharge is appropriate when the accused engages in bad conduct.

Trial defense counsel did not object to this argument. On appeal, however, he argues that trial counsel's argument was improper because: (1) the record contained no evidence that the appellant's misconduct had any effect on diplomatic relations with Japan; and (2) the presence of Japanese government officials in the gallery, combined with trial counsel's argument, improperly aimed to inflame the passions of the members. We disagree.

Arguments of trial counsel that are not objected to are reviewed for plain error. *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005). Plain error occurs when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right of the accused. *Id.*

It is error for trial counsel to put forth "arguments that unduly . . . inflame the passions or prejudices of the court members." *United States v. Marsh*, 70 M.J. 101, 102 (C.A.A.F. 2011) (quoting *United States v. Schroeder*, 65 M.J. 49, 58 (C.A.A.F. 2007)) (alteration in original) (internal quotation marks omitted); Rule for Courts-Martial 919(b), Discussion. Trial counsel "may prosecute with earnestness and vigor" and "may strike hard blows," but "is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88 (1935). Trial counsel is entitled "to argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence." *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000). Trial counsel's argument must also be viewed within the context of the entire court-martial rather than in isolation. *Id.* at 238 (citing *United States v. Young*, 470 U.S. 1, 16 (1985)).

We find no error in trial counsel's argument, let alone plain error. Assuming the local Japanese government officials remained in the courtroom for trial counsel's

---

[2] The appellant stated in his providence inquiry that Roppongi is an area of Tokyo.

argument, we see no grounds for concern in the combination of these two matters.  The presence of the officials was placed on the record well before the members arrived, and there is nothing in the record to indicate the members were informed about the identity of spectators in the gallery.  In addition, trial counsel never referred to the spectators or tied his argument toward the gallery in any way.

We also disagree with the appellant's contention that trial counsel improperly referred to matters outside the record.  Trial counsel's argument about rules that are in place to protect U.S.-Japanese relations did not refer to specific provisions but generally referred to matters of common knowledge at the appellant's installation. *See United States v. Kropf*, 39 M.J. 107, 108 (C.M.A. 1994) (holding it is proper for a trial counsel to comment on "contemporary history or matters of common knowledge within the community"); *United States v. Barrazamartinez*, 58 M.J. 173, 175 (C.A.A.F. 2003) (determining that trial counsel's reference to the war on drugs involved a matter of common knowledge).  Trial counsel also did not argue that the appellant's misconduct actually impaired diplomatic relations between the two countries; he merely asserted that the appellant's actions *could* impair relations and that the appellant fell well short of the type of representation the Air Force expects from its members.  The record amply supports these propositions, and we see no error in trial counsel's argument.

*Post-Trial Processing Delay*

The convening authority approved the adjudged findings and sentence on 22 November 2013.  The record of trial was not docketed with this court until 7 January 2014, 46 days later.  The record contains no accounting for the Government's actions during this time.

In *United States v. Moreno*, 63 M.J. 129 (C.A.A.F. 2006), our superior court established guidelines that trigger a presumption of unreasonable delay in certain circumstances, including where the record of trial is not docketed with the court of criminal appeals within 30 days of the convening authority's action. *Id.* at 142.  Where the delay is facially unreasonable, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972), to determine whether the delay has caused a due process violation of an appellant's right to timely post-trial review.  In addition, Article 66(c), UCMJ, 10 U.S.C. § 866(c), empowers the service courts to grant sentence relief for excessive post-trial delay without a showing of actual prejudice. *United States v Tardif*, 57 M.J. 219, 224 (C.A.A.F. 2002).

The appellant does not allege that this delay caused him prejudice or rose to the level of a due process violation, and we agree with this position.  We are cognizant of our broad authority to grant sentencing relief for post-trial delay even in the absence of a showing of prejudice, but we decline to exercise that authority in this case.  Utilizing the factors outlined by our Navy and Marine Corps colleagues in *United States v. Brown*,

62 M.J. 602, 606–07 (N.M. Ct. Crim. App. 2005), we find granting sentencing relief is not appropriate. In particular, we see no evidence that the short delay in this case demonstrates evidence of bad faith or gross negligence in the post-trial processing of this case.

*Sentence Appropriateness*

Finally, the appellant asserts his sentence is inappropriately severe when compared to that of a co-actor, Airman James Ethridge. Again, we disagree.

This court reviews sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006). Our plenary authority requires us to independently review the entire record in each case within our jurisdiction and to approve only that part of the sentence that we find should be approved. Article 66(c), UCMJ. "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offenses, the appellant's record of service, and all matters contained in the record of trial." *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009) (citations omitted). We are accorded great discretion in determining whether a particular sentence is appropriate, but we are not authorized to engage in exercises of clemency. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010).

As part of its Article 66(c) responsibility, this court is required "to engage in sentence comparison with specific cases . . . in those rare instances in which sentence appropriateness can be fairly determined only by reference to disparate sentences adjudged in closely related cases." *United States v. Lacy*, 50 M.J. 286, 288 (C.A.A.F. 1999) (quoting *United States v. Ballard*, 20 M.J. 282, 283 (C.M.A. 1985)) (internal quotation marks omitted). In doing so, we examine three questions of law:

> (1) whether the cases are "closely related" (*e.g.*, coactors involved in a common crime, servicemembers involved in a common or parallel scheme, or some other direct nexus between the servicemembers whose sentences are sought to be compared); (2) whether the cases resulted in "highly disparate" sentences; and (3) if the requested relief is not granted in a closely related case involving a highly disparate sentence, whether there is a rational basis for the differences between or among the cases.

*Id.* The "appellant bears the burden of demonstrating that any cited cases are 'closely related' to his or her case and that the sentences are 'highly disparate.' If the appellant meets that burden, . . . the government must show that there is a rational basis for the disparity. *Id.*

"Sentence comparison does not require sentence equation." *United States v. Durant*, 55 M.J. 258, 260 (C.A.A.F. 2001). If the cases sought to be compared are not closely related or the sentences are not highly disparate, this court may (but is not required to) nonetheless consider the compared cases when reviewing for sentence appropriateness and relative uniformity. *United States v. Wacha*, 55 M.J. 266, 267 (C.A.A.F. 2001).

The appellant successfully moved to attach documents from Airman Ethridge's court-martial to the record in this case. Airman Ethridge was convicted of a single use of cocaine during the same time as the appellant, and the appellant's providence inquiry demonstrates they used the cocaine at the same location at nearly the same time. Both contributed money toward the purchase of the cocaine. We therefore find that Airman Ethridge's case is closely related to the appellant's.

However, we find that Airman Ethridge's sentence is not highly disparate from his own. Airman Ethridge's adjudged sentence was a bad-conduct discharge, confinement for 25 days, restriction to the limits of Yokota Air Base for 30 days, and forfeiture of $1,000 pay. This sentence is quite similar to the appellant's adjudged and approved sentence. Pursuant to a pretrial agreement, the convening authority disapproved Airman Ethridge's bad-conduct discharge but approved the remainder of the sentence. The appellant argues that the disapproval of Airman Ethridge's bad-conduct discharge renders the two sentences highly disparate. However, this court has held that in making sentence comparisons, we compare the *adjudged* sentences rather than the approved sentences. *Anderson*, 67 M.J. at 706. The adjudged sentences are not highly disparate, and thus the appellant is not entitled to relief on sentence comparison grounds.[3] In addition, considering all matters in the record of trial and weighing the sentence in Airman Ethridge's case as part of our overall analysis of sentence appropriateness and relative uniformity, the appellant's sentence is appropriate.

*Conclusion*

The approved findings and the sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of the appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c).

---

[3] Even if we were to compare the approved sentences in these two cases, the Government has demonstrated a rational basis for the disparity, in part because Airman Ethridge was able to negotiate a pretrial agreement in return for certain concessions the appellant did not make.

Accordingly, the approved findings and the sentence are **AFFIRMED**.

FOR THE COURT

STEVEN LUCAS
Clerk of the Court

ACM S32198